IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL MADAFFARI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 02 C 4201 |
| | ) | |
| METROCALL COMPANIES GROUP | ) | |
| POLICY GL, H-21163-0, PLAN NUMBER | ) | |
| 501 and RELIASTAR LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974

("ERISA"), Plaintiff Cheryl Madaffari filed an Amended Complaint against Defendants ReliaStar

Life Insurance Company ("ReliaStar") and Metrocall Companies Group Policy GL, H-21163-0,

Plan Number 501 ("Plan 501"or "Plan") based on ReliaStar's denial of long-term disability

benefits.  Before the Court are the parties' Cross-Motions for Summary Judgment pursuant to

Federal Rule of Civil Procedure 56.  For the reasons discussed below, the Court grants

Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary

Judgment.

## BACKGROUND

### I.      Northern District of Illinois Local Rules

First, ReliaStar contends that Madaffari violated various provisions of Northern District of

Illinois Local Rule 56.1.  The Court thus turns to the rules governing the parties' summary

judgment filings before addressing the merits of the case.  Local Rule 56.1(a)(3) requires the

moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue."  Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial.  The purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments.  *Solaia Tech. LLC v. Arvinmeritor, Inc.*, 361 F.Supp.2d 797, 826-27 (N.D. Ill. 2005).

The types of evidentiary material available to support Rule 56.1 statements are numerous, but the most common materials include affidavits, deposition transcripts, and business documents.  *Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000).  Under Federal Rule of Civil Procedure 56(e), supporting and opposing affidavits must show that the affiant is competent to testify to the matters at hand, and the affidavit must contain facts that would be admissible at trial.  *Markel v. Board of Regents of the Univ. of Wisconsin*, 276 F.3d 906, 912 (7th Cir. 2002).  Further, the objective of Rule 56(e) "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."  *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990).

Statements and responses that do not properly cite to the record are subject to the Court's discretion as to their admission.  *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).  Statements that are not contested are deemed admitted.  *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).  Finally, when citing to the record in their legal memoranda, parties are required to cite to the numbered paragraphs of their Local Rule 56.1 statements and not to the underlying parts of the record.  *See id.* at 586; *see also Solaia Tech,* 361 F.Supp.2d at 826.  With these principles in mind, the Court turns to the material facts of this case.

## II. Material Facts

### A. Background

Madaffari seeks to reinstate her long-term disability benefits under her group insurance plan provided by Metrocall Companies. (Am. Compl. ¶¶ 5, 6.) Defendant ReliaStar underwrote the insurance for Plan 501 and issued Group Policy No. GH-21163-0 ("Group Policy") to Metrocall Companies. (R. 81-1, Defendants' Local Rule 56.1 Statement of Facts ¶ 5.) Beginning in July 1997, Metrocall employed Madaffari as a sales manager. (Defs' Stmt. ¶ 10; R. 78-1, Plaintiff's Local Rule 56.1 Statement of Facts ¶ 5.) Madaffari was a participant in Plan 501 and elected to participate in the long-term disability insurance provided by the Group Policy. (Defs' Stmt. ¶ 11; Pl.'s Stmt. ¶ 6.)

### B. Initial Long-Term Disability Eligibility Determination

As a sales manager, Madaffari worked 40 hours a week and frequently worked overtime. (Pl.'s Stmt. ¶ 11.) Her position involved sitting about 75% of the time and walking about 25% of the time. (*Id.*) Madaffari spent about 50% of her time outside and 75% of her time working around others. (*Id.*) Beginning on December 26, 1997, Madaffari was unable to perform her sales manager position and on April 9, 1998, she submitted an application for long-term disability benefits. (Defs' Stmt. ¶ 15.) According to Madaffari's statement in support of her long-term disability claim, the cause of her disability was "Asthma, Allergies." (*Id.* ¶ 16.) As part of her claim, Madaffari submitted a statement from her primary care physician, Dr. Michael Stewart, who diagnosed her with "Asthma – steroid dependent, severe allergic rhinitis, chronic sinusitis" and stated that Madaffari was totally disabled from performing the duties of her own occupation. (*Id.* ¶ 17; Pl.'s Stmt. ¶ 13.) On May 7, 1998, ReliaStar advised Madaffari that it had approved her claim for long-term disability benefits. (Defs' Stmt. ¶ 18.) ReliaStar also informed Madaffari that

under the Plan, her long-term disability benefits would be payable up to age 65 "as long as you are totally disabled as defined by the Plan." (*Id.*)

C.      **Relevant Plan Language**

The Plan's definition of "Total Disability" states:

**Total Disability, Total Disabled –**

•       until you have qualified for monthly income benefits for 60 months, you are unable to do the essential duties of your own occupation, due sickness or accidental injury.

•       after you have qualified for monthly income benefits for 60 months, you are unable to work at any occupation you are or could reasonably become qualified to do by education, training or experience.

(Defs' Stmt. ¶¶ 18, 19; Pl.'s Stmt. ¶ 9.)  Furthermore, the "Termination of Benefits" section states:

**Termination of Benefits**

ReliaStar Life stops paying benefits on the earliest of the following:

•       The end of the maximum benefit period for any one period of disability.  The maximum benefit period is shown on the Schedule of Benefits.

•       The date you no longer qualify under all the conditions listed.

•       The date of your death.

•       The date you refuse to participate in an approved rehabilitation program.

•       The date you are no longer disabled, as defined, including:  For any period of up to 60 months, the date your employment earnings are equal to or exceed 80% of your indexed basic monthly earnings.  For any period of disability longer than 60 months, the date your earnings ability is equal to or exceeds 70% of your basic monthly earnings.

If the Group Policy or the Disability Income Insurance part of the Group Policy terminates after you qualify to receive benefits, ReliaStar Life continues your benefit payments.  Benefits are paid as long as you continue to qualify according to the terms of the Group Policy in effect on the date you qualified.

(Defs' Stmt. ¶ 21.)

**D.      Updating Madaffari's Medical File (1998-99)**

In August 1998, ReliaStar, through a third-party claims administrator, sent a letter to Madaffari requesting that she update the information in her medical file.  (*Id.* ¶ 23.)  In September 1998, Madaffari responded and provided answers to a "Claimant Questionnaire" and an "Activities of Daily Living Questionnaire."  (*Id.* ¶ 24.)  In both questionnaires, Madaffari described her medical condition as "chronic asthma, severe sinusitis, fatigue."  (*Id.* ¶ 25.)  She also provided the names and addresses of her treating physicians.  (*Id.*)

In December 1998, ReliaStar sent letters to four of Madaffari's physicians requesting that they provide copies of her medical records.  (*Id.* ¶ 26.)  Three of her physicians responded in January 1999 and the fourth physician responded in May 1999.  (*Id.* ¶ 27.)  Dr. David Conley sent the first set of records and according to Madaffari's "CT Sinus Screening" that he conducted, Madaffari suffered from moderate to severe sinusitis.  (*Id*. ¶ 28.)  Dr. Kris McGrath sent a set of records and filled out a "Medical Management Questionnaire - Asthma."  (*Id*. ¶ 29.)  According to Dr. McGrath, Madaffari had asthma, rhinitis, and sinusitis and her current course of condition was stable.  (*Id.* ¶ 30.)  Also, another treating physician, Dr. Martha Howard, provided records concerning Madaffari's asthma, sinusitis, and rhinitis, and recommended continued environmental controls.  (*Id.* ¶ 31, Kuhn Aff., Ex. 3, at 00372.)

In May 1999, Dr. Stewart, Madaffari's primary care physician, produced Madaffari's updated medical records to ReliaStar.  (*Id.* ¶ 32.)  Dr. Stewart's notes indicated that Madaffari suffered from chronic allergic rhinitis and steroid dependent asthma.  (*Id.*, Kuhn Aff., Ex. 3, at 00306; Pl.'s Stmt. ¶ 20.)  Also in May 1999, Madaffari's specialist, Dr. Lawrence Pollack, provided medical records and completed a Physical Capacities Evaluation ("PCE").  (Defs' Stmt. ¶ 34.)  The PCE indicated that Madaffari could sit and stand for six hours a day, but could only

walk one hour a day. (*Id*. ¶ 35.) Also, Madaffari could lift/carry ten pounds maximum, occasionally carry small objects, and could perform functions such as simple grasping, fine manipulation, keyboarding, pushing/pulling, and operating foot controls. (*Id*.) She could occasionally bend, kneel, and reach above her shoulders, but she could not climb or crawl. (*Id*.) The PCE also shows that Madaffari was restricted to the exposure of marked changes in temperature and humidity and to dust, fumes, and gases. (*Id*.)

### E.     Independent Medical Evaluation (1999)

In July of 1999, ReliaStar arranged for Madaffari to undergo an Independent Medical Evaluation ("IME") with a pulmonary function specialist, Dr. Sanjeev Kalra. (Defs' Stmt. ¶ 36; Pl.'s Stmt. ¶ 22.) Dr. Kalra performed the IME on August 10, 1999 and prepared a report and PCE that same day. (Defs' Stmt. ¶ 38; Pl.'s Stmt. ¶ 26.) Dr. Kalra concluded that Madaffari suffered from chronic bronchial asthma, rhinitis, and sinusitis. (Defs' Stmt. ¶ 38, Kuhn Aff., Ex. 3, at 00263-267.) He further reported that "during exacerbations, she experiences chest tightness, resting dyspnea, and has essentially a dry cough." (*Id., Ex. 3, at 00264.*) Also, Dr. Kalra opined that Madaffari "was not in any acute cardiopulmonary distress" and that her "restrictions and limitation of daily activities appear to be consistent with a light work capacity." (*Id.*; Pl.'s Stmt. ¶ 35.) Further, he concluded that, "Given the paroxymsmal nature of illness and bronchial asthma, it is difficult to appropriately classify the level of Ms. Madaffari's impairment." (Pl.'s Stmt. ¶ 32.) Dr. Kalra also noted that he could not make a diagnosis of steroid-dependent asthma due to the lack of adequate data in Madaffari's medical file. (*Id.* ¶¶ 30, 40.)

According to Dr. Kalra's PCE, Madaffari could sit for eight hours a day, stand for two, and walk for one, and she could lift/carry twenty pounds maximum "at a time when asthma not in exacerbation." (Defs' Stmt. ¶ 39, Kuhn Aff., Ex. 3, at 00269-270.) Further, the PCE stated that

Madaffari could continuously do tasks such as simple grasping, fine manipulation, keyboarding, pushing/pulling, and operating foot controls.  (*Id.*)  Dr. Kalra also noted that Madaffari could frequently bend, kneel, and squat, and occasionally climb, crawl, reach above her shoulders, and reach forward.  (*Id.*)

On September 20, 1999, ReliaStar submitted Dr. Kalra's IME report to Madaffari's treating physicians, Drs. Pollack and Stewart, and requested that they review the report and provide comments.  (*Id.* ¶ 40.)  On September 27, 1999, Dr. Pollack signed the letter confirming that he received the IME report and made no additional comments.  (*Id.* ¶ 41.)  Dr. Stewart's assistant advised ReliaStar that Dr. Stewart had no comments concerning the IME.  (*Id.* ¶ 42.)

### F.     Surveillance of Madaffari

In the fall of 1999, ReliaStar hired a company to conduct a third-party surveillance of Madaffari.  (*Id.* ¶ 43, Pl.'s Stmt. ¶ 46.)  According to the first report, "we have been able to determine that your subject is a somewhat active person, and is known to operate a motor vehicle, conduct household activities, and travels on occasion."  (Defs' Stmt. ¶ 43, Kuhn Aff., Ex. 3, at 00148.)  The surveillance report also stated that "we are informed by neighborhood sources familiar with your subject that she is in fact seen to be a somewhat active individual" and "when observed outside of her residence, your subject is not known to display any outward signs of disability."  (*Id.*, Ex. 3, at 00150.)  In a follow-up investigation, the third-party observed and videotaped Madaffari loading items into her sports utility vehicle and breathing on her own without the assistance of any devices.  (*Id.* ¶ 44, Kuhn Aff., Ex. 3, at 00144.)

### G.     Updating Madaffari's Medical File (2000)

In January 2000, Madaffari prepared and submitted another "Activities of Daily Living" form to ReliaStar.  (*Id.* ¶ 45.)  She acknowledged that her daily activities included driving, taking

public transportation, performing some housework, and shopping. (*Id.*, Kuhn Aff., Ex. 3, at 00134-138). Furthermore, Madaffari noted that she had trouble sleeping due to difficulty breathing and that she is often short of breath. (*Id.*)

In February 2000, ReliaStar asked Dr. Pollack to produce copies of Madaffari's updated medical records and asked him to fill out another PCE. (*Id.* ¶ 46.) ReliaStar assessed the records sent from Dr. Pollack's office as follows: "According to the PCE completed by Dr. Pollack on 3/15/00 the claimant has the ability to function at a sedentary level. The restrictions noted are environmental conditions such as marked changes in temperature, working in high places, exposure to dust, fumes & gases and driving automotive equipment in a working and personal environment." (*Id.* ¶ 47, Kuhn Aff., Ex. 3, at 00126.) The report further stated: "Dr. Pollack primarily treated the claimant for asthma, sinus infections, wheezing, SOB and coughing. Medications seem to control however she has frequent episodes." (*Id.*)

Dr. Pollack's updated PCE indicated that Madaffari was restricted to one hour of walking per an eight hour work day, that Madaffari could lift ten pounds maximum and carry small objects, and that she was not restricted from performing functions such as handling, fingering, feeling, pushing/pulling, and operating foot controls. (*Id.* ¶ 48, Kuhn Aff., Ex. 3, at 00228-230.) The PCE further reflects that Madaffari could occasionally stoop, kneel, balance, crouch, reach above her shoulders, and reach forward. (*Id.*) Dr. Pollack also determined that Madaffari had not achieved maximum medical improvement. (*Id.*)

In March 2000, ReliaStar ascertained that Madaffari was seeing Dr. Murray Salzman, a pulmonologist, and requested that Dr. Salzman provide copies of Madaffari's medical records. (*Id.* ¶ 49.) After receiving Dr. Salzman's records, ReliaStar assessed that he had treated Madaffari for "asthma, allergic hints and goiter." (*Id.* ¶ 50, Kuhn Aff., Ex. 3, at 00125.) ReliaStar

summarized Dr. Salzman's report, stating that Madaffari's "asthma was inadequately controlled; therefore the claimant's medication was changed. Due to symptoms persisting, Dr. Salzman increased the prednisone and added an inhaler." (*Id.*; Pl.'s Stmt. ¶ 41.)

**H.      Independent Review of Madaffari's Medical File (2000)**

ReliaStar then referred Madaffari's file to a board certified physician, Dr. Bernard Stevens, for another independent review. (Defs' Stmt. ¶ 51.) On June 28, 2000, Dr. Stevens completed his review of Madaffari's file. (*Id.* ¶ 52.) Dr. Stevens stated: "The file supported that this individual can perform light work with environmental limitations. Exposure to heat, humidity and cold must be limited cumulatively to no more than two to three hours per workday. Likewise, comparable exposure to dust, smoke, fumes and other industrial aerosols must also be similarly limited. There were no other supportable restrictions or limitations." (*Id.*, Kuhn Aff., Ex. 3, at 00116.) Furthermore, Dr. Stevens concluded that "though this individual had asthma, it was well controlled with treatment. Clinically, clear lungs were noted on various temporally dispersed examinations. There were no current hospital stays or emergency room visits. The claimant is/was active physically. Pulmonary functions studies showed normal physiology." (*Id.*, Ex. 3, at 00117.)

In his PCE, Dr. Stevens noted that Madaffari's condition did not restrict her from sitting, standing, or walking in an eight-hour workday. (*Id.* ¶ 53, Kuhn Aff., Ex. 3, at 00118.) He also concluded that she could lift, carry, or exert force up to twenty pounds. (*Id.*) Further, he stated that Madaffari could frequently climb, stoop, kneel, balance, crouch, crawl, reach above her shoulders, and reach forward. (*Id.*, Ex. 3, at 00119.) Finally, Dr. Stevens noted that Madaffari had achieved maximum medical improvement. (*Id.*)

## I. Disability Recommendation

Shortly after Dr. Stevens' independent evaluation, the third-party claims administrator prepared and submitted a "Disability Recommendation" in which it advised ReliaStar that Madaffari did not meet the applicable definition of disability and that ReliaStar should terminate her long-term disability benefits. (*Id.* ¶ 54.) After reviewing this "Disability Recommendation," ReliaStar arranged for a rehabilitation counselor to conduct a vocational assessment of Madaffari's job. (*Id.* ¶ 55.) According to the study, Madaffari's sedentary job would not expose her to dust, fumes, or gases, and only involve exposure to one environmental factor, which was "moderate noise intensity level." (*Id.*)

In November of 2000, ReliaStar concluded its investigation and determined that Madaffari no longer satisfied the Plan's definition of disability. (*Id.* ¶ 56.) On November 30, 2000, ReliaStar sent Madaffari a five page letter explaining why they were terminating her long-term disability benefits. (*Id.*; Pl.'s Stmt. ¶¶ 51, 52.)

## J. Madaffari's First Administrative Appeal

Following the termination of her long-term disability benefits, Madaffari retained legal counsel and on January 23, 2001, she commenced an administrative appeal that consisted of a three page letter from her attorney. (Defs' Stmt. ¶ 57.) In the letter, counsel argued that ReliaStar's November 30, 2000, letter improperly assessed how Madaffari's medical condition affected her ability to work and ignored her sleep disorder. (*Id.*, Kuhn Aff., Ex. 3, at 00215-217.) Further, counsel argued that no changes had occurred in Madaffari's impairment to support ReliaStar's denial of her long-term disability benefits. (*Id.*, Kuhn Aff., Ex. 3, at 00215-217.)

Consequently, ReliaStar convened a meeting of its ERISA Review Committee ("Committee") to consider Madaffari's administrative appeal. (*Id.* ¶ 58.) The Committee referred

Madaffari's medical file to an independent consultant, Dr. Mark Johnson, for review. (*Id.* ¶ 59.) On March 8, 2001, Dr. Johnson completed his review and submitted a report of his findings. (*Id.* ¶ 60.) In his report, Dr. Johnson concluded: "The records do not show that Ms. Madaffari is substantially impaired by her condition and do not show that she is incapable of performing her job as a Sales Manager." (*Id.*, Kuhn Aff., Ex. 3, at 00108.) Furthermore, Dr. Johnson concluded that Madaffari's sleep disorder could be treated and would not prevent her from returning to gainful employment. (*Id.*) In summary, Dr. Johnson opined that "Ms. Madaffari is not totally disabled and that she is capable of performing sedentary to light physical duty activities, whether on or off the job." (*Id.*, Ex. 3, at 00109.)

Thereafter, the Committee reconvened to assess Dr. Johnson's findings and concluded that ReliaStar should deny Madaffari's appeal. (*Id.* ¶ 61.) Accordingly, by a letter dated March 27, 2001, ReliaStar explained to Madaffari that it had affirmed its earlier eligibility determination and that she "no longer met the definition of Total Disability under the Metrocall Companies Long Term Disability Policy beyond November 30, 2000." (*Id.* ¶ 62, Kuhn Aff., Ex. 3, at 00106; Pl.'s Stmt. ¶ 59.) Also in the March 27 letter, ReliaStar explained to Madaffari her right to appeal the Committee's decision and that any further appeal of the eligibility determination must contain medical evidence or documentation to support her position. (Defs' Stmt. ¶ 62, Kuhn Aff., Ex. 3 at 00106-107.)

### K. Madaffari's Second Administrative Appeal

On May 31, 2001, Madaffari appealed the Committee's decision denying her request for benefits reinstatement. (*Id.* ¶ 63; Pl.'s Stmt. ¶ 60.) In Madaffari's second appeal, she argued that ReliaStar applied the incorrect standard in determining her eligibility, that the termination was arbitrary and capricious because her condition had not changed, and that ReliaStar relied upon an

inadequate and flawed IME and "Overview of Activities Assessment." (Defs' Stmt. ¶ 63, Kuhn Aff., Ex. 3, at 00082-85.) Madaffari, however, did not include additional treatment records from her physicians, new test results, or new medical opinions to support her second appeal. (*Id.*)

The Committee reconvened to consider Madaffari's second appeal. (*Id.* ¶ 64.) In a letter dated July 10, 2001, ReliaStar informed Madaffari that it was denying her request for benefits reinstatement. (*Id.*; Pl.'s Stmt. ¶ 62.) In the letter, ReliaStar explained that it applied the correct standard in determining Madaffari's eligibility and that based on her medical file, she did not have a severe impairment and had the capacity for performing light work. (Defs' Stmt. ¶ 64, Kuhn Aff., Ex. 3, at 00081.) The Committee also noted that Madaffari did not provide additional medical information to support her claim, as required. (*Id.*) The Committee then concluded that the decision to terminate her long-term disability benefits was correct. (*Id.*)

### III.    Procedural History

On October 6, 2004, Madaffari filed a motion for expanded discovery in this action. (R. 56-1.) In response to her motion, Defendants argued that the Plan's language gave ReliaStar discretion in making eligibility determinations. Thus, Defendants contended that because review of the plan administrator's decision to deny Madaffari's benefits was under the arbitrary and capricious standard, the Court should not allow Madaffari to take additional discovery. After a careful analysis of the Plan's relevant language, the Court concluded that the arbitrary and capricious standard applied under the circumstances, and thus denied Madaffari's request for extended discovery. (R. 61-1.)

Without a cogent explanation, Madaffari requests the Court to revisit this ruling. Because Madaffari has not established a good reason for the Court to depart from its earlier decision, under the "law of the case" doctrine, the Court will not revisit this ruling. *Tice v. American Airlines,*

*Inc.*, 373 F.3d 851, 853 (7th Cir. 2004); *see also White v. Godinez,* 301 F.3d 796, 803 (7th Cir. 2002) ("[U]nder the law of the case doctrine, we do not reopen issues decided in earlier stages of the same litigation unless we have strong conviction that the earlier ruling was wrong and the party that benefitted from the earlier ruling would not be unduly harmed.").

Also in her discovery motion, Madaffari argued that because ReliaStar was both the claims administrator and insurer, an inherent conflict of interest existed. The Court rejected this argument based on established Seventh Circuit case law. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981 (7th Cir. 1999); *see also Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998). Again, Madaffari attempts to address this issue in her motion for summary judgment, yet fails to give a reason for the Court to change its decision. *See Tice*, 373 F.3d at 853. As such, the Court will not revisit its ruling.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *Id.* at 255.

---

[1] For these same reasons, the Court will not re-examine its ruling that ReliaStar is a proper defendant under ERISA, as ReliaStar requests in its motion for summary judgment.

Accordingly, on cross-motions for summary judgment, the Court construes all the facts and inferences in favor of the party against whom the motion under consideration is made. *Tegtmeier v. Midwest Operating Eng'r Pension Trust Fund,* 390 F.3d 1040, 1045 (7th Cir. 2004). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion. *Butts v. Aurora Health Care, Inc.,* 387 F.3d 921, 924 (7th Cir. 2004). Instead, the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Id.*

## ANALYSIS

As discussed above, the Court previously determined that the arbitrary and capricious judicial standard applies because the Plan gave ReliaStar discretionary authority to determine eligibility. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (deference is due when "the benefit plan gives the administrator or fiduciary discretionary authority" to "construe the terms of the plan"). When reviewing an eligibility determination under the arbitrary and capricious standard, the Court's review is limited to the information submitted to the Plan's administrator. *Perlman,* 195 F.3d at 980-82. Under this highly deferential standard, the Court does not ask whether the Plan administrator reached the correct conclusion or whether it relied on the proper authority. *Kobs v. United Wis. Ins. Co.,* 400 F.3d 1036, 1039 (7th Cir. 2005). Instead, the Court considers whether the administrator's decision was "completely unreasonable." *Id.* Therefore, the Court will not overturn ReliaStar's decision to deny Madaffari's long-term disability benefits if "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a

consideration of the relevant factors that encompass the important aspects of the problem."

*Houston v. Provident Life & Accidental Ins. Co.,* 390 F.3d 990, 995 (7th Cir. 2004) (internal

quotations and citation omitted).  Madaffari provides six reasons why ReliaStar's denial of her

long-term disability benefits was unreasonable.

I.      **Full and Fair Review**

Madaffari argues that ReliaStar did not provide a full and fair review of her disability

claim.  When a plan administrator denies a claimant's benefits, "ERISA requires that specific

reasons for denial be communicated to the claimant and that the claimant be afforded an

opportunity for 'full and fair review' by the administrator."  *Hackett v. Xerox,* 315 F.3d 771, 775

(7th Cir. 2003) (citing *Halpin v. W.W. Grainger,* 962 F.2d 685, 688-89 (7th Cir. 1992)); *see also* 29

U.S.C. § 1133.  Federal regulations provide guidelines for claims procedures, including the

requirements of the written denial notice:

> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f).  "These requirements ensure that when a claimant appeals a denial to

the plan administrator, he will be able to address the determinative issues and have a fair chance to

present his case."  *Halpin,* 962 F.2d at 689.

When determining whether a plan complies with these regulations, the Seventh Circuit has

concluded that substantial compliance with the regulations is sufficient.  *Hackett,* 315 F.3d at 775;

*see also Militello v. Central States,* 360 F.3d 681, 689 (7th Cir. 2004). "Whether termination procedures substantially complied is a fact-intensive inquiry guided by the question of whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review." *Hackett,* 315 F.3d at 775.

Here, ReliaStar sent Madaffari three letters explaining in detail why it terminated her long-term disability benefits, including a thorough discussion of the supporting medical evidence. In the initial denial letter of November 30, 2000, ReliaStar cited the relevant plan provisions and then set forth an overview of the medical information in Madaffari's file, including reports from Drs. Conley, McGrath, Stewart, Pollack, Kalra, Salzman, and Stevens. (Defs' Stmt. ¶ 56, Kuhn Aff., Ex. 3, at 00111-12). After reviewing the medical evidence, ReliaStar assessed Madaffari's activities, including the observations made during the third-party surveillance. (*Id*., Ex. 3, at 00112-13.) ReliaStar also gave an overview of how Madaffari described her job and the vocational assessment performed by the certified rehabilitation counselor. (*Id*., Ex. 3, at 00113.) Further, ReliaStar explained why it was denying Madaffari's long-term disability benefits. Specifically, ReliaStar determined that based on the medical evidence and activities assessments, Madaffari's impairments did not prevent her from performing the duties of her own occupation. (*Id*., Ex. 3, at 00112-113.) Finally, ReliaStar outlined Madaffari's rights to appeal. (*Id*., Ex. 3, at 00114.)

Despite ReliaStar's thorough analysis and reasoning behind its denial of Madaffari's benefits, Madaffari contends that ReliaStar did not afford her a full and fair review. Specifically, Madaffari contends that ReliaStar (1) did not provide her with an opportunity to review the evidence in the administrative record, (2) failed to tell her how to perfect her claim, and (3) did

not compile an adequate administrative record.  The Court addresses each argument in turn.

**A.      Madaffari's Review of Administrative Record**

First, Madaffari contends that ReliaStar did not tell her "she could review the information utilized by the Defendants in their decision-making process to ensure they were accurate and complete."  (R. 77-1, Pl.'s Memorandum in Support of Summary Judgment, at 5.)  Madaffari does not substantiate this assertion with facts in the record or make any legal arguments supporting her claim.  As such, Madaffari has waived this argument, and thus the Court will not consider it.  *See Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived"); *Volvosek v. Wisconsin Dep't of Agr. Trade & Consumer Prot.,* 344 F.3d 680, 689 n. 6 (7th Cir. 2003) (complete absence of legal argument waives consideration of claim).

**B.      Perfect Claim**

Next, Madaffari contends that ReliaStar failed to tell her how to perfect her claim.  *See* 29 C.F.R. § 2560.503-1(f)(3).  The administrative record, however, reflects that ReliaStar repeatedly contacted Madaffari to supply information to perfect her claim and provided her information concerning the overall claim procedures.  Accordingly, ReliaStar substantially complied with the regulations.  *See Hackett,* 315 F.3d at 775.

Turning to the "Claim Procedures" section of the Group Insurance Plan itself, the Court notes that this section explains how to submit a claim, where to get proof of loss forms, and what written proof of loss includes.  (Kuhn Aff., Ex. 3, at 00058.)  Further, on several occasions ReliaStar contacted Madaffari and explained what information it needed for Madaffari to keep her benefits and reminded her that she was required to follow up with her physicians.  (*See, e.g.,* Ex. 3, at 00207).  Per ReliaStar's request, Madaffari updated her file, including filling out additional Activities of Daily Living and Claimant Questionnaires.  (*Id.*).  Also, ReliaStar called Madaffari

concerning her updated medical files on many occasions.  (Ex. 3, at 00179, 00133, 00130, 00128.)  Finally, in the denial letter of November 30, 2000, not only did ReliaStar specifically state what was required for Madaffari to appeal the denial, the letter directed her to "review your employee handbook for a more detailed explanation of your rights under ERISA."  (Ex. 3, at 00114.)

### C.    Administrative Record Deficiencies

Last, Madaffari contends that ReliaStar did not compile an adequate administrative record.  Specifically, Madaffari argues that the file is hard to read, not in any specific order, and contains over 400 pages of materials.  Madaffari, however, does not explain how ReliaStar neglected to substantially comply with the controlling ERISA regulations by failing to keep an organized administrative record.  Furthermore, Madaffari does not cite any legal authority supporting her argument and the Court is not aware of any provision contained within ERISA which establishes specific organizational requirements of administrative records.  Therefore, this argument fails.

In further support of her argument that ReliaStar did not properly compile her administrative record, Madaffari contends that there are two records naming other people in her file, specifically Cheryl Madattori and Cheryl Murrow.  The document that refers to "Cheryl Murrow" is a PCE filled out on May 14, 1999, by Madaffari's primary care physician, Dr. Stewart.  (Kuhn Aff., Ex. 3, at 00303-04.)  In fact, the PCE contains Madaffari's ReliaStar claim number.  (*Id*.)  The use of the name "Madattori" is simply a misspelling.  The "Madattori" document contains lab test results that were part of Madaffari's 2000 medical records from Buffalo Grove Internal Medicine Associates.  (*Id.*, Ex. 3, at 00220-227.)  Other documents in this record spell Madaffari's last name properly.  (*Id*.)

Madaffari also asserts that ReliaStar did not properly follow-up with her primary care physician, Dr. Stewart, after ReliaStar asked Dr. Stewart to make comments on the IME conduct

by Dr. Kalra. The record indicates, however, that ReliaStar called Dr. Stewart's office for his input and Dr. Stewart's assistant advised ReliaStar that Dr. Stewart did not have any comments concerning the IME. (Defs' Stmt. ¶ 42.) This argument is simply not supported by the record.

Finally, Madaffari contends that the record did not contain an accurate description of her job. Contrary to her assertion, the administrative record contained Madaffari's own description of her job and a vocational assessment performed by the certified rehabilitation counselor. Madaffari does not explain why her own job description and the vocational assessment were not accurate, and thus she has waived this argument. *See Estate of Moreland,* 395 F.3d at 759.

## II.    Evidence in Administrative Record

Next, Madaffari contends that when making its eligibility determination, ReliaStar (1) ignored evidence and selectively relied on parts of the record, and (2) failed to weigh the evidence in her favor. She contends that these failures render ReliaStar's eligibility determination unreasonable.

### A.    Ignoring Evidence in Record

In support of her argument that ReliaStar ignored evidence in the record, Madaffari asserts that ReliaStar disregarded her treating physicians' reports when determining her eligibility. The record, however, indicates that ReliaStar requested and collected medical records from all of Madaffari's physicians, reviewed and assessed the submitted documentation, and explained the significance of her physicians' assessments in the "Overview of Medical Information" section of her initial denial letter. (*Id.*, Ex. 3, at 00111-12.)

Madaffari further argues that *all* of her medical providers concluded that she had "Steroid-Dependent Asthma, Chronic Allergic Rhinitis and Chronic Sinusitis." Madaffari's specialist Dr. Lawrence Pollack, however, provided a diagnosis of "moderate persistent asthma, "perennial

rhinitis" and "allergic sinusitis." (Kuhn Aff., Ex. 3, at 00267.) Dr. Pollack's diagnosis is similar to Dr. Kalra's IME where he concluded that Madaffari suffered from chronic bronchial asthma, rhinitis, and sinusitis. (Defs' Stmt. ¶ 38, Kuhn Aff., Ex. 3, at 00263-267.)

In addition, Madaffari claims that ReliaStar ignored her worsening condition. In support, she cites to her attorney's arguments in her appeal letter and her own affidavit that is not part of the administrative record. Counsel's letter contains arguments, not undisputed facts, and the Court cannot rely on Madaffari's affidavit because it is beyond the scope of the Court's review. *See Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decisions means review on the administrative record.").

The only evidence in the administrative record that could possibly indicate that Madaffari's condition had worsened was Dr. Salzman's March 2000 report in which Dr. Salzman noted that Madaffari's asthma was inadequately controlled. (Kuhn Aff., Ex. 3, at 00125.) Dr. Salzman changed Madaffari's asthma medication to address this issue. (*Id.*) Viewing the administrative record as a whole, the change in Madaffari's asthma medication does not support the conclusion that ReliaStar was arbitrary and capricious in denying Madaffari's benefits. *See Militello,* 360 F.3d at 687 (courts review entire record to determine whether plan administrator was arbitrary and capricious).

### B.      Weighing Evidence in Record

Madaffari also claims that ReliaStar was required to weigh the evidence in the administrative record in her favor. Madaffari misstates the law. ReliaStar was not required to weigh the evidence in Madaffari's favor, but instead, weigh the evidence for and against the termination of benefits and, within reason, articulate why it rejected certain evidence. *See Hackett,* 315 F.3d at 775; *Halpin,* 962 F.2d at 695. ReliaStar's letters setting forth the reasons for

its denial of Madaffari's long-term disability benefits complied with the specific reasons requirement, *see* C.F.R. § 2560.503-1(f), as discussed above. ReliaStar properly weighed the evidence under this standard. *See Coles v. LaSalle Partners Inc. Disability Plan*, 287 F.Supp.2d 896, 902 (N.D. Ill. 2003)(denial letters demonstrated that administrator weighed evidence because administrator substantially complied specific reasons requirement under regulations).

## III.    Independent Medical Examination

Madaffari's next challenges ReliaStar's reliance on Dr. Kalra's IME. She asserts that when ReliaStar requested Dr. Kalra to perform the IME, ReliaStar was "foreshadowing the results." Specifically, in its letter requesting the IME, ReliaStar asked Dr. Kalra to consider certain questions, including (1) "Are the claimant's restrictions and limitations consistent with the diagnosis of Steroid Dependent Asthma, Sever Allergic Rhinitis and Chronic Sinusitis?" and (2) "Are the claimant's restrictions and limitations and daily activities consistent with light work capacity?" (Kuhn Aff., Ex. 3, at 00165.) By asking these questions, Madaffari argues that ReliaStar eliminated the possibility of a bias-free report.

Although Madaffari criticizes Dr. Kalra's conclusions, she does not draw a connection between her arguments and ReliaStar's request that Dr. Kalra answer certain questions.[2] Madaffari's argument is further weakened by the fact that ReliaStar shared the results of Dr. Kalra's IME with her treating physicians, Drs. Pollack and Stewart, and requested their input. *See Hightshue v. AIG Life Ins. Co.,* 135 F.3d 1144, 1148 (7th Cir. 1998) ("Seeking independent expert advice is evidence of a thorough investigation."). Further, it is not uncommon for plan

---

[2]  Madaffari compares her treating physicians' reports to the IME when criticizing Dr. Kalra's conclusions. The Court notes, however, that plan administrators need not accord special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831-33, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

administrators to request physicians conducting IMEs to answer certain questions.  *See, e.g.,*
*Houston,* 390 F.3d at 993.

In any event, Madaffari does not cite legal authority or make any legal arguments to
support her bias claim, and the Court refuses to make Madaffari's legal arguments for her.  *See*
*Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996) ("Given our adversary system of
litigation, it is not the role of this court to research and construct the legal arguments open to
parties, especially when they are represented by counsel.") (citation omitted).  Madaffari's
argument that Dr. Kalra's report was biased is without merit.

## IV.    Dr. Stevens' Review

Madaffari's fourth argument for overturning ReliaStar's eligibility determination is that
the June 2000 report prepared by Dr. Bernard Stevens was based on inaccurate information in the
administrative record.  Specifically, Madaffari argues that Dr. Stevens relied on false information
that she belonged to the Gold Coast Multiplex health club because this health club membership
was inactive.  ReliaStar concedes the point that this health club membership was inactive.
Nonetheless, in her "Activities of Daily Living Questionnaire" that Madaffari completed in
January 2000, she indicated that she was an active member of the "Forest Grove Athletic Club."
(Kuhn Aff., Ex. 3, at 00137.)  Accordingly, any reliance on Madaffari's membership at a health
club was not in error.

Madaffari also contends that Dr. Stevens erred when relying on the third-party surveillance
because it was inaccurate.  Madaffari claims that the surveillance was based on a three-minute
videotape, without any sound, and that there is no indication that the person depicted is actually
Madaffari.  The third-party surveillance report indicates, however, that the investigators  relied on
neighborhood sources and first hand observations, as well.  (Kuhn Aff., Ex. 3, at 00148-152.)

Viewing the facts in a light most favorable to Madaffari, her argument concerning the videotape is not supported by the facts in the administrative record.

Further, Madaffari argues that ReliaStar's request for Dr. Stevens to conduct a second independent medical review of her record eleven months after Dr. Kalra's IME was somehow irregular and improper, and thus the second report was a mere "rubber-stamp" allowing ReliaStar to deny her benefits. Madaffari cites a Third Circuit case in which a plan administrator submitted the claimant to an IME during the appeal process. *Kosiba v. Merck & Co.,* 384 F.3d 58, 67 (3d Cir. 2004). In *Kosiba*, the Third Circuit concluded that this irregularity raised an inference of bias because "every piece of evidence" in the record supported claimant's contention that she was disabled. *Id.*

The circumstances in *Kosiba* are distinguishable from the case at hand. First, Dr. Stevens conducted the second IME before the appellate process. Viewing the evidence in a light most favorable to Madaffari, not "every piece of evidence" in Madaffari's administrative record supported a finding of disability, as the evidence did in *Kosiba*. *See id.* Finally, Madaffari does not point to specific evidence to support her claim of impropriety and irregularity. Instead, she makes conclusory accusations based on speculation which cannot raise a genuine issue of material fact for trial. *Butts,* 387 F.3d at 924 (party must present definite, competent evidence to rebut summary judgment motion).

## V. Madaffari's Ability to Perform Routine Tasks

Next, Madaffari argues that ReliaStar improperly relied upon her ability to perform certain routine household activities when making its eligibility determination. Relying on *Hillock v. Continental Cas. Co.,* No. 02-5126, 2004 WL 434217, at 6 (N.D. Ill. Mar. 2, 2004), Madaffari contends that whether she can perform routine household activities does not necessarily mean that

she can perform her full-time job.  In *Hillock,* the court relied on the Seventh Circuit's opinion in *Hawkins* in concluding that engaging in a certain amount of home activities does not prove that a person is not disabled.  *Id.; Hawkins,* 326 F.3d at 918.

Viewing the facts in a light most favorable to Madaffari, although ReliaStar relied on her ability to perform household tasks, it also relied on other instances of activity and physicians' reports to determine her disability.  For instance, ReliaStar relied on the third-party surveillance explaining Madaffari's other activities, such as her ability to travel and drive a motor vehicle.  (Kuhn Aff., Ex. 3, at 00112.)  In her 2000 "Activities of Daily Living Questionnaire" Madaffari indicated that she drove, took public transportation, performed housework, and shopped.  ReliaStar also relied on her primary care physicians' PCE that stated Madaffari had the capacity to function at a medium exertion level.  (Ex. 3, at 00113.)  Simply put, the record reflects that ReliaStar relied on more than Madaffari's ability to perform some household tasks when making its disability determination.

## VI.    Definition of Disability

Last, Madaffari contends that ReliaStar used the wrong definition of disability under the Plan when it denied her disability benefits.  The Plan defines "Total Disability, Total Disabled" as either:

- until you have qualified for monthly income benefits for 60 months, you are unable to **do the essential duties of your own occupation**, due sickness or accidental injury, or

- after you have qualified for monthly income benefits for 60 months, you are unable to work at any occupation you are or could reasonably become qualified to do by education, training or experience.

(Defs' Stmt. ¶¶ 18, 19; Pl.'s Stmt. ¶ 9.) (emphasis added).

Madaffari argues that ReliaStar used the "after 60 months" definition and that the

appropriate definition is "until 60 months."  ReliaStar agrees that the relevant definition is the "until 60 months" definition, but asserts that it did apply this definition in its denial of Madaffari's disability benefits.  The Court agrees.  Although the November 30, 2000, denial letter initially discusses the "after 60 months" definition, the remainder of the letter applies the "until 60 months" definition stating such language as "you possess the ability to perform the job duties of **your own occupation** as defined"and "we have determined that you retain the capacity to **perform your own occupation**."  (Kuhn Aff., Ex. 3, 00113.) (emphasis added).

In sum, based on the undisputed material facts in the record, the Court cannot conclude that ReliaStar's decision to deny Madaffari's long-term disability benefits was "completely unreasonable."  *See Kobs,* 400 F.3d 1039.  In other words, ReliaStar offer a reasoned explanation, based on the evidence in Madaffari's medical file, for denying Madaffari's long-term disability benefits.  *See Houston*, 390 F.3d at 995; *see also Tegtmeier,* 390 F.3d at 1045 ("If the administrator made an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then that decision is final.").

## <u>CONCLUSION</u>

For these reasons, the Court grants Defendants' Motion for Summary Judgment and denies

Plaintiff's Motion for Summary Judgment.

Dated:  June 15, 2005

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**